MITTELSTAEDT (INC.) *v.* UNITED STATES (No. 2200).[1]

CRAPED WOOL MATERIAL AND MANUFACTURES DISTINGUISHED.

The merchandise is craped wool. It is made from wool tops by a number of manufacturing processes, including dying, crimping, and braiding on two cotton cords, at an expense of about seventy cents a pound, and is used as material in the manufacture of hair rolls, dolls' wigs, and theatrical wigs and moustaches. Such wool is too far advanced to be classified under paragraph 286, tariff act of 1913, as combed wool or tops or roving or roping or wool advanced beyond the washed or scoured condition, and has become a manufacture of wool under paragraph 288.

United States Court of Customs Appeals, March 17, 1923.

APPEAL from Board of United States General Appraisers, G. A. 8559 (T. D. 39221).

[Affirmed.]

*Walden & Webster* (*Edward F. Jordan* of counsel) for appellant.

*William W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

[Oral argument January 24, 1923, by Mr. Jordan and Mr. Lawrence.]

Before MARTIN, Presiding Judge, and SMITH and BARBER, Associate Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise in this case is craped wool. It consists of wool, dyed, crimped, and braided on two cotton cords. It is imported in the form of braids. The cords seem to serve two purposes, one to facilitate the handling of the article until it is ready for its ultimate

---

[1] T. D. 39537.

use, and the other to keep the crimp tight. The processes employed in producing it will be later referred to.

Witnesses testified that it was dealt in as "crêpe wool," "wool crêpe," or "wool crape." One of the invoices referred to it as "crêped wool tops."

It was assessed as a manufacture of wool at 35 per cent ad valorem under paragraph 288 of the act of 1913, which provides for "cloths, knit fabrics, felts not woven, and all manufactures of every description made by any process wholly or in chief value of wool, not specially provided for."

The importer claims it dutiable under paragraph 286 of the act which provides for "combed wool or tops and roving or roping made wholly or in part of wool or camel's hair and on other wool and hair which have been advanced in any manner or in any process of manufacture beyond the washed or scoured condition not specially provided for."

The Board of General Appraisers sustained the assessment of the collector.

It is evident that the determination of this question involves one that has often been litigated, viz, What is a manufacture?

It is to be observed that raw wool is entitled to free entry (par. 650 of the act) and that the conditions of wool mentioned in paragraph 286, under which importer claims are all the result of manufacturing processes applied to raw material.

What such processes are was shown by the testimony of a witness for the importer who said that wool tops were produced as follows: "Scoured wool (is) put through the cards; then as they come from the cards they are made into balls, wound into balls; then those balls go through a machine that we call a back washer. These balls are unrolled and then they go through a warm solution of soap and water to take out the dirt; then they go over a calender to dry; then they go through two sets of gills to further eliminate any short stock and make them still more parallel than when they came from the cards; then they are reballed; now they are ready to go to the comb." He further testified that in the combing machine the top was finished and the function of that machine he described "as putting all the ends in so they can come in contact in the circles."

How the imported article was produced is shown by the following testimony from a government witness who said that wool tops were converted into crêped wool in the following manner: The top was first dyed, then put through a gilling box which reduced the thickness of the sliver; then it went through a drawing box which still further reduced such thickness; then through a spindle box which put the spindle on the bobbins; then through a braiding machine which produced the braids of the importation; these braids were

then put into tanks of hot water and boiled from two to four hours; they were then baked and dried and then wrapped in bundles. He. produced exhibits showing the result of each of these operations, the. final product being apparently like the sample of the importation. When unbraided and separated from the cords with which it was braided it presents a light, crimped fluffy appearance and is then used as material in the manufacture of hair rolls, dolls' wigs, theatrical wigs and moustaches, and is used for such purposes only. And the. evidence tended to show that in its imported condition the merchan-. dise is not adapted for the common uses to which wool tops are put. The cost of converting wool tops into craped wool was testified to be. approximately 70 cents per pound.

We think this statement of the facts clearly indicates that the. true classification of this merchandise is that adopted by the collector.

To attempt to analyze and distinguish the various cases referred to in the briefs is unnecessary. The merchandise is not now combed wool or tops or roping or roving. It is craped wool. By the treat-. ment to which it has been subjected it has been set apart to very limited uses for which wool tops without such treatment are unsuited. Neither is it wool which has been advanced in any manner or by any process of manufacture beyond the washed or scoured condition not specially provided for in Paragraph 286, because it is a manufacture of wool under paragraph 288, and if it were equally under both it, would take the higher rate of duty.

On the question of what constitutes a manufacture the following among many other cases may be referred to: Anheuser-Busch Asso-. ciation *v.* United States (207 U. S. 556), Tide Water Oil Co. *v.* United States (171 U. S. 210), Ishimitsu *v.* United States (11 Ct. Cust. Appls. 186; T. D. 38963), Fenton *v.* United States, 1 Ct. Cust. Appls. 529; T. D. 31546), United States *v.* Richter (2 Ct. Cust. Appls. 167; T. D.. 31680).

The judgment of the Board of General Appraisers is *affirmed.*