FUJII SHOTEN *v.* UNITED STATES (No. 3116)[1]

United States Court of Customs and Patent Appeals, April 29, 1929

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*John F. Kavanagh* and *Fred J. Carter*, special attorneys, of counsel), for the United States.

[Oral argument April 4, 1929, by Mr. Carter]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and GARRETT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The appellant in this case imported merchandise which was entered at the port of Honolulu, Hawaii, in December, 1922. This merchandise was invoiced as cotton wadding, and was assessed for duty at 40 per centum ad valorem under paragraph 921 of the Tariff Act of 1922 as being a "manufacture of cotton not specially provided for."

The importer made protest insisting that it should have been classified under paragraph 1560 simply as "cotton" and therefore admitted free of duty. There was an alternative claim that it might be admitted at 5 per centum ad valorem under paragraph 901 as "cotton waste, manufactured or otherwise advanced in value," but this claim is formally waived in appellant's brief and is eliminated, so that the issue presented is whether the merchandise was properly classified as dutiable under paragraph 921 or free under paragraph 1560.

These paragraphs read as follows:

PAR. 921. All articles made from cotton cloth, whether finished or unfinished, and all manufactures of cotton or of which cotton is the component material of chief value, not specially provided for, 40 per centum ad valorem.

PAR. 1560 (this under the free list). Cotton and cotton waste.

It may be stated that in this instance cotton is the sole material used, so that, if it be a manufacture, it is wholly a manufacture of cotton and no complication with other material is involved.

---

[1] T. D. 43362.

The determination of the issue depends, therefore, upon whether the material as imported had undergone such processing or treatment as to render it a "manufacture of cotton" in the sense of paragraph 921, and this, as we view it, is largely a question of fact.

Appellant introduced only one witness. He testified that he had been examiner of merchandise for the Government at the port of San Francisco for eight years—Japanese merchandise as a general thing; that prior to that he was in the variety business; that he worked in a cotton mill about a year some 20 years prior to the date of his testimony and since had been through cotton mills in all the departments on a great many occasions. Upon being shown the official sample, he stated that he was familiar with the product; that the sample was "after the first process"; that in the making of the article "after the cotton is taken out of the bale it is put through a machine and broken down in order to get it in shape for the carding machine"; that the sample had not been carded; that it was not made from a waste but from commercial cotton and was in an intermediate stage between the cotton as picked and cotton thread. The witness was not very clear upon the question of possible uses of the sample in its imported condition, but it seems fairly deducible that he was of opinion that it could be used for "wadding" in "comfortables and quilts and things of that sort."

The case was first heard in the court below solely upon the evidence of this witness, so far as testimony was concerned, and appellant was given the relief asked, but a retrial was granted at which the Government introduced 10 witnesses; and upon the rehearing the court below reversed its former decision and rendered judgment in favor of the Government, from which the present appeal was taken.

These witnesses introduced by the Government we think may be properly declared to be experts in either manufacturing, selling, or handling this class of merchandise. Each of them was shown to have had extensive experience in his line of activity and to be thoroughly familiar with the commodity and the different operations utilized in bringing it to the stage shown to exist at the time of its importation and entry.

R. B. Hughes, for 15 years an examiner of merchandise at the port of New York and who had extensive experience officially observing the processes of production employed in the United States in the making of such an article, gives these in detail. His description, in substance, is as follows:

The raw cotton—that is, cotton in its ginned state, the lint with seed removed—is first placed into a breaker picker, usually situated on an upper floor, in which the cotton is fed upon a lattice to spiked rollers placed in successive pairs, the function of which is to pull the slabs of cotton apart and dash it against a series of grid bars

through which the dust and heavy dirt passes. The product is then passed along an inclined plane to the picking machine which is usually situated on a lower floor. In this machine the partly cleaned cotton passes through feed rollers and is subjected to two blade beaters, revolving at a high rate of speed. This converts the cotton into a fleecy mass, and it is again forced against grid bars, further cleaning it of dirt and other impurities. It is then passed through rollers to a card machine, from whence it is passed on in a filmy webbing of fibers to what is called an apron and then through rollers onto a metal flat. Successive webs keep coming and are placed one on top of the other by the machine until the required thickness is obtained, the result being a product formed of interlaced, interwoven cotton fibers.

This testimony of Mr. Hughes is corroborated by seven of the other witnesses and contradicted by none.

The record shows that the product thus made is commercially known in the trade, and was so known prior to and at the time of the passage of the Tariff Act of 1922; that there are different names— cotton felt, felted cotton, cotton batting, cotton felt batts, cotton wadding, cotton tags, and cotton pads; and that these all mean the same thing and are well understood by the trade to mean the product whose manufacture the witness Hughes described as recited above, and which is similar to the merchandise involved in this case.

In this state the product has a number of distinct uses as related by various of the Government's witnesses. Among these are the making of comforters, upholstery, automobile cushions and fillings, mattresses, pillows, and numerous other uses.

These uses require the cotton to be in the stage reached by the several operations described. It could not be used for these purposes if not processed to that point, nor if processed further. Indeed, there is no evidence that this product is ever advanced to any other stage unless it be in the making of surgical dressings, which fall under another provision of the Tariff Act of 1922. The record shows that the processes for making cotton yarns are different, or that at least they would normally begin at one of the stages back of what we think may properly be called the cotton-felt stage, which we find to be the stage of the import under consideration.

It is succinctly stated by Mr. Justice Weller in his opinion in the Customs Court:

It is also established that the merchandise has lost its identity as raw cotton and can no longer be used for the ordinary purposes of cotton spinning without first being reduced to the fiber state and recarded.

The determination of what is a "manufacture" of a given article, or when a thing is "manufactured." as contemplated in the tariff laws, is not always free of difficulty.

There has been much litigation and the subject has been frequently before this court, as well as other courts, and numerous decisions are cited in the briefs of both appellant and appellee: *Bahnsen* v. *United States,* 7 Ct. Cust. Appls. 385, T. D. 36962; *United States* v. *National Importing Co.,* 12 Ct. Cust. Appls. 186, T. D. 40169; *United States* v. *Dudley,* 174 U. S. 170; *Ishimitsu* v. *United States,* 11 Ct. Cust. Appls. 186, T. D. 38963; *Fenton* v. *United States,* 1 Ct. Cust. Appls. 529, T. D. 31546; *Tidewater Oil Co.* v. *United States,* 171 U. S. 216; *United States* v. *Richter,* 2 Ct. Cust. Appls. 167, T. D. 31680; *Anheuser Busch* v. *United States,* 207 U. S. 556; *Mittelstaedt* v. *United States,* 11 Ct. Cust. Appls. 471, T. D. 39537; *Unkart, Travis & Co.* v. *United States,* 22 Treas. Dec. 828, T. D. 35527; *U. S. Express Co.* v. *United States,* T. D. 22759.

In the case of *Ishimitsu* v. *United States, supra,* at page 189, this court said:

The determination of what is a "manufacture" of a given article, or when a thing is "manufactured" within the contemplation of tariff statutes, has occupied the attention of the courts in a great number of cases to review a majority of which is a task of no small magnitude, and which we do not deem it necessary to undertake.

The derivation from the Latin *manus,* hand, and *facie,* to make, of "manufacture" as a noun, indicates that its original meaning was something made by hand, while as a verb it would mean the hand processing necessary to produce the thing. While this meaning has been enlarged, yet there still remains the idea that to constitute a manufacture of a thing, or a thing manufactured, it must appear that something has been produced, so changed, or advanced in condition from what it was before being subjected to the processing or treatment that whether of only one material or of more than one it has attained a distinctive name, character, or use different from that originally possessed by the material or materials before being subjected to the manufacturing process.

We do not deem it necessary, under the facts of this case, to enter upon an elaborate review of the decisions cited, or to attempt a definition further than to say that in the opinion of the court an article which, as a result of processing, has been made into a new and different article having a distinct use or uses as a finished product without further manipulation or treatment, differing from its original use, renders it a manufacture of the material or materials out of which it is made, in the contemplation of the tariff law. It is not necessary that it should be confined to a single use, as counsel for appellant seems to argue. It may have many uses. *Hartranft* v. *Wiegmann,* 121 U. S. 609.

The merchandise which is the subject of litigation in this case clearly falls within this definition, and is, therefore, a manufacture of cotton under the Tariff Act of 1922 and is properly classified under paragraph 921 thereof and dutiable thereunder at 40 per centum ad valorem.

The judgment of the Customs Court is *affirmed.*